| | |
|---|---|
| FOAM EMPIRE, INC., on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br><br>HICKORY SPRINGS MANUFACTURING COMPANY, VALLE FOAM INDUSTRIES, INC., DOMFOAM INTERNATIONAL, INC., THE CARPENTER COMPANY, THE WOODBRIDGE GROUP, FLEXIBLE FOAM PRODUCTS, INC., SCOTTDEL INC., FOAMEX INNOVATIONS, INC., FUTURE FOAM, INC., VITAFOAM PRODUCTS CANADA LIMITED, VITAFOAM, INC.<br><br><br>        Defendants. | **CLASS ACTION COMPLAINT** |

Plaintiff, Foam Empire, Inc., brings this action for damages and injunctive relief for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the antitrust laws of the United States against defendants Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel Inc., Foamex Innovations, Inc., Future Foam, Inc., Vita-foam Products Canada Limited, and Vitafoam Inc., which are or were operating in the market known as polyurethane foam in the United States between at least 1999 and the present. Plaintiff, Foam Empire, Inc. alleges as follows:

## NATURE OF THE ACTION

1.      This case arises out of a conspiracy among defendants and their coconspirators to fix the prices of polyurethane foam and polyurethane foam products ("polyurethane foam"). During the Class Period, and earlier, defendants conspired to fix, raise, maintain and/or stabilize prices of polyurethane foam by the means and mechanisms described herein. As set forth below, the conspiracy is reflected in specific and detailed communications by executives and employees of defendants who have communicated with one another to fix prices and allocate customers.

2.      This case is brought as a class action on behalf of all persons who, from at least as early as 1999 to the present (hereinafter, the "Class Period"), purchased polyurethane foam, directly from one or more of the Defendants or their co-conspirators.

3.      As alleged herein, defendants explicitly agreed with each other to charge inflated prices for polyurethane foam. Every price increase known during the class period was the result of conspiratorial discussions among defendants to fix prices. Defendants also agreed to allocate customers in specific communications between each other.

4.      As a direct and proximate result of Defendants' unlawful conduct and price-fixing conspiracy, plaintiff and the members of the Class (defined below) have paid unlawful, artifi-

cially higher prices for polyurethane foam, than they would have paid in a competitive market, and therefore, have suffered injury to their respective businesses and property.

5.      Plaintiff has been a direct purchaser of polyurethane foam from one or more of the Defendants during the Class Period.  Plaintiff brings this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

## PLAINTIFF

6.      Plaintiff Foam Empire, Inc. ("Foam Empire") is a sole proprietorship with its principal place of business located at Paramount, California.  During the Class Period, Foam Empire purchased polyurethane foam directly from one or more of the Defendants.

7.      The prices Foam Empire paid to defendants for polyurethane foam was greater than the prices it would have paid absent the conspiracy alleged herein. Foam Empire has therefore been injured in its business and property by reason of defendants' antitrust violations.  Foam Empire asserts its claims on behalf of itself and all direct purchasers who, during the Class Period, purchased polyurethane foam from one or more of the Defendants which resulted in injury.

## DEFENDANTS

8.      Defendant Hickory Springs Manufacturing Company is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, NC 28601.  During the Class Period, Hickory Springs directly sold polyurethane foam throughout the United States.

9.      Hickory Springs Manufacturing Company is one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world.  The furniture industry is

2

the largest segment of Hickory Springs's customer base. With more than 160 flexible polyurethane foam formulations, Hickory Springs is one of the United States' largest producers of foam.

10.     Defendant Valle Foam Industries, Inc. is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, ON L6T 2H7. During the Class Period, Valle directly and/or through its control of its affiliates sold polyurethane foam throughout the United States.

11.     Valle manufactures slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries

12.     Defendant Domfoam International, Inc. is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C Canada. During the Class Period Domfoam sold polyurethane foam throughout the United States.

13.     Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam. Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco elastic foam. According it to its website, "[i]n its 260,000 square-foot Montreal plant, Domfoam services the demanding urethane market in Canada and in the USA by meeting the toughest industry standards and requirements." Domfoam provides foam for the following purposes: mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, anti-static foam, anti-microbial foam, visco-elastic foam, camping foam, and sporting goods.

14.     Defendant The Carpenter Company is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond Virginia, 23230. Carpenter operates from around 30 locations in the United States, 5 locations in Canada and around 20 locations in Europe. During the Class Period, Carpenter directly sold polyurethane foam throughout the United States.

3

15. Carpenter is the largest manufacturer of polyurethane foam cushioning in the world. It has divisions on the following areas: air filter media, bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene systems, flexible foam packaging furniture, molded manufacturing, polyester fiber, and tire products.

16. Defendant The Woodbridge Group is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. During the Class Period, Woodbridge directly sold polyurethane foam throughout the United States.

17. Woodbridge's primary focus is supplying foam for automotive components, but also supplies other sectors including: commercial and recreational transportation, building products, construction, packaging and several consumer and industrial markets.

18. Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin. It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio. During the Class Period, Flexible Foam directly sold polyurethane foam throughout the United States.

19. Flexible Foam manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and automotive industries.

20. Defendant Scottdel Inc. is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. During the Class Period, Scottdel directly sold polyurethane foam throughout the United States.

21. Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

4

22.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

23.     Foamex provides foam for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its foam is used in automotive cushioning, shipping packages, beds and furniture, as well as personal electronics.  Foamex also provides components for filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives

24.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N, Council Bluffs, IA 51501.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

25.     Future Foam produces foam products for bedding, foam blocks, carpet cushion, furniture, and packaging.

26.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada. During the Class Period, Vitafoam Canada sold polyurethane foam, either directly or through its affiliates, throughout the United States.

27.     Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams. It also produces latex mattresses and toppers.

28.     Vitafoam Inc. ("Vitafoam Inc.") is a privately owned and operated company with its headquarters located a 2215 Shore Drive, High Point, NC 27263.  During the Class Period, Vitafoam Inc. sold polyurethane foam, either directly or through its affiliates, throughout the United States.  Collectively, Vitafoam Canada and Vitafoam Inc. are referred to as Vitafoam.

5

29.     Vitafoam, Inc. manufactures plastic netting, automotive products, general trade, and nonwoven products.  It produces mattresses and pads, convoluted pads, wheelchair components, and protective packaging for medical supplies, as well as positioning and support wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial healthcare industries.  The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.  It also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven webs, films, and other substrates, as well as carpet underlay for residential and commercial sectors. Vitafoam, Inc. also serves medical, marine, technical, bedding, lamination, and carpet underlay industries.

## CO-CONSPIRATORS AND AGENTS

30.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

31.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337 and 15 U.S.C. §§15, 26.

33.     Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

34.     This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of polyurethane foam sold to purchasers in this district; (b) transacted business in polyurethane foam and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district.  Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

## The Polyurethane Foam Market

35.     Polyurethane foams are used to insulate objects or reduce shock.  Specifically, Polyurethane foams are used in bedding, packaging, seat cushioning, carpet cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of consumer applications.

36.     Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links.  It can be flexible or rigid, but generally has a low density.

*/*

37.     Flexible polyurethane foam is most often used in bedding and upholstery, while the more rigid variety is used for products thermal insulation and in automobile dashboards. Microcellular foam may be used to make car steering wheels or line the insides of athletic helmets. Elastomeric foam is typically used to make the outer sole of many types of footwear, including athletic shoes.

38.     The four classes of polyurethane foam, all with different physical properties, are created by varying a basic addition polymerization reaction involving a diol or polyol, a diisocyanate, and water.

39.     The diisocyanate reacts with the diol or polyol to create the urethane polymer. Water reacts with some of the isocyanate groups to produce carbon dioxide gas, and the bubbles get trapped in the viscous liquid as it polymerizes, expands, and solidifies. Catalysts and surfactants can be added to boost the reactions and control the foaming process. A wide range of other additives, including stabilizers, dyes, fire retardants, and fungicides, may be added to meet specific performance demands. Auxiliary blowing agents, such as hydrofluorocarbons, liquid carbon dioxide, and acetone, are also typically used to prepare the foam. Ultimately, the kinds and amounts of raw materials used in the manufacturing process help determine how the final product performs.

40.     To manufacture foam for cushioning, two basic procedures are used. In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand. Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slab is then cut, stored, and allowed to cure for up to 24 hours. This manufacturing procedure is the "slabstock" production process. The cured foam is subsequently fabricated into useful shapes. Most foams for use in furniture and bedding are produced this way.

8

41.     A second method, foam molding, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place.  This process is used primarily for automotive cushioning (such as seats, armrests, and headrests), although some contract furniture utilizes molded cushions.  This foam is sometimes referred to as "semi-flexible."

42.     Flexible foams have mainly open cells, formed by gas bubbles that have popped. Air can pass through the foam easily, resulting in a soft, resilient, flexible material. In rigid foams, most of the cells stay closed.  The material is thus harder and less resilient.  Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility.

43.     Flexible foam is widely used for its qualities: it is light weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  Flexible foam may also be molded and cut.  More than 1.2 billion pounds of foam are produced and used every year in the U.S.

44.     Rigid polyurethane foam has many relevant applications in construction.  Many odd and detailed shapes such as sculptures and domed ceilings are far easier to make with foam than with wood.  Some manufacturers sell specialty rigid foam that is used to replace wood in carved signs and three-dimensional topography models.  It is also used as home insulation, rigid boat hulls, tennis racket grips, and surfboards.

45.     There are few acceptable alternatives for polyurethane foam.  In furniture and bedding applications, short staple polyester fiber or cotton may be used, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well, but must be insulated from the user with some type of cushioning material.  According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in

9

the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

46.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.  Furniture and furnishings account for 36.7% of industry revenue. The major products in this segment include pillows, seating, cushioning, mattress cores and quilt rolls.  Transportation products account for 19.1% of the industry revenue.  This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks.  Building and construction account for 12% of industry revenue.  Packaging products account for 5.3% of industry revenue.  Major packaging products include protective shipping pads and food containers.

47.     There has been a recent trend towards consolidation within the industry.  Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years.  For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV.  Carpenter owns approximately 16.3% of the market share in this industry.

48.     After its parent corporation was acquired in 2006, Vitafoam Inc. sold one plant to Olympics Product, LLC, a joint venture between Woodbridge and Hickory Springs.  It sold another plant to Flexible Foam Products.

49.     Defendants alleged here to be participants in the conspiracy are most of the major North American polyurethane foam producers representing a significant portion of the United States market.  There are virtually no imports of products in this industry due to the prohibitive freight costs involved in transporting these bulky, low unit priced products over long distances.

**Defendant Vitafoam's Admission of a Conspiracy**

10

50.     In February 2010, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with this investigation.

51.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division. This fact, in and of itself, is significant. It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws. The significance of obtaining a conditional leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's website at http://www.usdoj.gov/atr/public/criminal/239583.htm:

> *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, *the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.* Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.
>
> When the model corporate conditional leniency letter was first drafted, the Division did not employ a marker system. Thus, companies received conditional leniency letters far earlier in the process, often before the company had an opportunity to conduct an internal investigation. However, the Division's practice has changed over time. The Division now employs a marker system, and the Division provides the company with an opportunity to investigate thoroughly its own conduct. While the applicant may not be able to confirm that it committed a criminal antitrust violation when it seeks and receives a marker, by the end of the marker

11

process, *before it is provided with a conditional leniency letter, it should be in a position to admit to its participation in a criminal violation of the Sherman Act.* The Division may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter. *A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency.* Previously the model conditional leniency letters referred to the conduct being reported as*"possible* […price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act." (emphasis added).

### The Conspiracy to Fix Prices and Allocate Customers

52.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to polyurethane foam in North America.

53.     Another Vitafoam employee, a former vice president of Sales and Marketing for Vitafoam, worked in the polyurethane foam industry since 1963.  He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products.  This former vice president worked for Vitafoam in Canada until March 2009 when he retired.  He, along with other individuals at Vitafoam, as well as other companies, had been involved in a long-running price fixing and customer allocation conspiracy that included North America and the United States.

54.     The impetus for the conspiratorial conduct was typically increases in raw material costs.  Defendants (or "foamers" as they are referred to at times in the industry) utilize chemi-

cals, including polyols and toluene diisocyanate (or "TDI") in the manufacturing of polyurethane foam.

55.     When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, the foamers contacted each other. During the communications, the Defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases. The former president of Vitafoam has knowledge that this type of concerted activity has gone on for at least 20 to 25 years.

56.     During this period, there was an understanding and agreement among the competitors in the foam industry to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with typically the same effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

57.     The former president of Vitafoam, along with his subordinates, had conspiratorial discussions with competitors concerning this conspiracy to fix prices and to allocate customers. These discussions included Tony Dacosta, Al Zinn, and Doug Dauphin of defendant Foamex; Max Tenpow of defendant Carpenter; Bruce Schneider of defendant Future Foam; Don Coleman of defendant Hickory; and Robert Valle and Dean Bryiannis of defendant Valle Foam.

58.     Vitafoam had a policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice.

59.     As part of the conduct to coordinate or support price increases, the former Vitafoam president instructed his sales people to send copies of their draft price increase letters to competitors.

13

60.     In addition to discussions he had with competitors, the salespeople of Vitafoam also had discussions with the other defendants concerning price increases and the timing of those increases.  These discussions involved inquiries as to whether each competitor was going to support the price increase, when the price increases were going to be issued and what the effective dates would be of the increases.  Vitafoam personnel who participated in these discussions included Steve Prescott, Gerry Hannah, David Gurley, Frank Roncandin, George Newton, and Phil Fonseca.

61.     The former vice president and others at Vitafoam also participated in conspiratorial conduct with many individuals employed by numerous companies including: Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Dalton Foam, Scottdel, and Foamex.  Individuals at the various competitors included: Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Bryiannis and Robert Val of Valle Foam; Doug Dauphin and Tony Dacosta of Foamex; and John Howard of Domfoam.  Others at Vitafoam who engaged in this conduct included Steve Prescott, David Gurley, George Newton, and Tim Prescott.

62.     The former vice president of Vitafoam had communications in furtherance of the conspiracy with Mark Kane of the Defendant Carpenter Group.  He and Kane had discussions on multiple occasions involving price increases concerning a shared customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former vice president and Kane called each other and sent by fax copies of draft price increase letters.

63.     Robert Valle and Tony Vallecoccia of Valle Foam also communicated with other Defendants – their competitors – by telephone and also faxed each other copies of their draft

price increase letters that would be sent to customers so as to coordinate and collude on price increase percentages and their effect dates.

64.     Vitafoam employee David Gurley was a manager involved in scrap foam, which was obtained for use in carpet underlay production.  Gurley also had numerous contacts with U.S. polyurethane competitors.  As a result of his contacts with competitors, Gurley provided the former Vitafoam executives, as well as Steve Prescott with draft price increase letters and information.

65.     During the class period, Vitafoam employee George Newton contacted Carpenter employee Max Tenpow regarding price increases and the effective dates.

66.     During these price increase time periods, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

67.     A former Woodbridge employee who was employed in Ontario, Canada, from 1986 until 2009 participated in the conspiracy. While working at Defendant Woodbridge, this employee served most recently as vice president of Commercial Sales where he had authority to determine prices.  This former Woodbridge employee is currently employed at Vitafoam as their Vice President of Sales, a position he has held since April 2009.  In his current position he has authority to determine prices.  This current Vitafoam vice president has, along with other individuals employed by Defendants, been engaged in a long-running price fixing and customer allocation conspiracy.

68.     This current Vitafoam vice president has engaged in the conspiratorial activity by reaching understandings and agreements on price increases with most of Vitafoam's competitors for the same percentage and on the same effective date.  He has had personal involvement in this conduct since the early 1990's when he became involved in pricing at Woodbridge, and continued when he joined Vitafoam.  This activity involved the U.S. and Canadian markets.  The ob-

15

jective of the price increase scheme was for the conspirators to collectively pass raw material cost increases on to their customers, as well as to maintain their respective market shares.

69.    The participants in this conduct with the current Vitafoam vice president included Woodbridge, Vitafoam, Foamex, Carpenter, Vitafoam U.S., Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam.  The Vitafoam vice president coordinated price increases among competitors, as did co-workers of his at Woodbridge and Vitafoam.  The individuals involved in the conspiracy included Bill Lucas and Rik Hennink of Vitafoam U.S.; Peter Farah, Mel Himel, Bob Zorak, David Gurley and Ted Giroux of Vitafoam; Tony Vallecoccia of Valle; Donald Phillips and Vincent Bonaddio for Foamex; Bob Magee, Martin Mazza, and Gus Pasquarelli of Woodbridge; Buster Mann, Todd Councilman and Don Coleman of Hickory Springs; Michael Crowell of Flexible Foam; and Louis Carson of Scottdel.

70.    The current Vitafoam vice president's discussions relating to coordinating price increases among competitors were conducted primarily by means of telephone, electronic mail, and in-person meetings.  In person discussions frequently took place at meetings of the Polyurethane Foam Association ("PFA") trade group.

71.    The current Vitafoam vice president and other participants in this conspiracy took numerous steps to avoid detection of their conspiracy.  At times, full names would not be used in correspondence and instead participants would only using first names or initials.  Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Another method to avoid detection involved going to a local Staples or other office store to use

Case 5:10-cv-00129-RLV   Document 1   Filed 09/08/10   Page 17 of 34

the public facsimile machines to send each other price increase letters without the identifying facsimile transmission banner.

72.     On May 26, 2010, Vice President of Sales for Vitafoam attended a PFA meeting in Baltimore, MD.  While there, he discussed foam pricing with competitor Michael Crowell of Flexible Foam.  This conversation involved him being asked by Crowell why Vitafoam was not raising prices or following the increase.

73.     The former Director of Corporate Engineering at Woodbridge is now the President of Vitafoam.  He worked at Woodbridge from 1985 until January 2008. As the Director of Corporate Engineering he had authority to determine prices at Woodbridge.  As the President of Vitafoam, a position he has held since August 2008, he now has authority to determine prices at Vitafoam.  He, along with other individuals of Defendant companies, also participated in the long-running price fixing and customer allocation conspiracy.

74.     Discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge, included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases.  These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversation.

75.     This individual participated in conspiratorial discussions concerning pricing in the foam industry while at Woodbridge and Vitafoam with various competitors, including: Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam. These discussions led to a clear understanding and agreement that after the participants would

17

discuss the price increases and effective dates, they would then implement increases in accordance with that coordination.

76.     Virtually every known price increase, going back to at least 1999 and until Vitafoam's entry into the leniency program in the industry, has involved conspiratorial discussions among Defendants on pricing. Chemical price increases from the major suppliers were the impetus for discussions.

77.     While at Vitafoam, the current President has received Vitafoams' competitors' draft price increase letters from other Vitafoam personnel, including David Gurley. These include an email of David Gurley in which he acknowledges receiving draft price increase letters from competitor Don Simpson of Hickory Springs.

**Efforts to Enforce the Conspiracy**

78.     Defendants also undertook efforts to police the conspiracy. Participants, including the former Vice President of Vitafoam, followed up after discussions with competitors to see if the specific price increases and effective dates were actually being implemented. For example, the Vitafoam V.P. called Valle and Carpenter to see if those competitors were putting the increases through as they had discussed and agreed.

**Examples of Specific Communications Regarding Price Fixing and Customer Allocation**

79.     On May 12, 2010, in Cleveland, Ohio, a telephone call occurred between Bruce Schneider of Future Foam and the President of Vitafoam. Schneider works at Future Foam headquarters. Sometime prior to this call, Schneider had placed a call to Vitafoam's President inquiring about Vitafoam's price increase plans. During the call of May 12, 2010, Schneider discussed price increases involving foam producers. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st. There is a letter out from Carpenter for 31st of May. This is a letter out from Flexible for June 1st. Foamex sent a letter two weeks ago at 15%

18

but it looks like now that the increase is going to be 10 and 12% on foam." The Vitafoam President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?" Schneider responded: "Oh, from the other, the other people the foamers? Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so." The conversation concluded with a request for information from Schneider. "If you hear anything from your friends in Europe. What's going on over there, I sure would like to know that as well."

80.     On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the President of Vitafoam. In this message, Schneider stated, "Hi [President], this is Bruce Schneider… If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

81.     In another instance, the current President of Vitafoam heard from a customer that Valle was not increasing prices. The President then had the Vitafoam Vice President of Sales speak with Tony Vallecoccia of Valle to find out why Valle was not following the coordinated price increase.

82.     On May 20, 2010, John Howard, President of Domfoam, called the Vice President of Sales of Vitafoam twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers. He stated:

> "Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices. If he wants a battle, I'll give him a battle…These guys have been in at accounts they've never sold at…if he wants a battle, he's got one. We will start going after his accounts and it won't be pretty. We'll both end up hurting…I'm pissed off and our sales guys are pissed off and they're saying 'John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us. So. I'll let the dogs loose or I don't let the dogs loose. Want to mill it over and give me a shout back?"

19

The Vice President of Vitafoam responded:

> "It's sort of a bad time for me right now." Howard then stated "I don't expect an answer right now but, I'm leaving tomorrow night for a week. I would like to at least give the guys some indication that, 'Guys, give me another week. I think the dust is going to settle.' Or, 'Guys just do what you have to do. Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do. We have to respond.' So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

83.     On May 25, 2010, the Vice President of Vitafoam called Howard back. Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit. But let him make his decision and if it's to continue going after them then tell him there'll be some consequences. That's it. I'm not gonna, no threats but I can't not do anything. The sales guys are getting kind of…'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.' You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.'…Keep an eye on this guy, it's ah, he needs coaching, there you go."

84.     On May 25, 2010, Howard left a voicemail message for the Vice President of Vitafoam:

> "Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing , vis-à-vis going after each other's accounts. I'd be quite happy just to let it settle right here and not do anything more. But if [the President of Vitafoam] got some real pres-

sure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off. So, give it some thought and maybe over the next day or two, just give me a shout and let me know. I understand you can't over-ride [President of Vitafoam], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys,' That's not a winning strategy for us either. So, give me a call in the next day or two would you? And let me know what course of action Widmer's going to take here."

85.  On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vita-

foam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

86.  On June 3, 2010, Dean Bryuiannis of Valle called Steve Prescott of Vitafoam:

| Bryuiannis: | "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see." |
| --- | --- |
| Prescott: | "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it." |
| Bryuiannis: | "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett." |
| Prescott: | "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah." |
| Bryuiannis: | "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do." |
| Prescott: | "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes." |
| Bryuiannis: | "Yah, yah. Alright. Well our letter is out so hopefully I'm assuming you've probably put something out by now." |

21

| | |
|---|---|
| Prescott: | "It's as good as done." |
| Bryuiannis: | "Okay. Well we're already out, so we've already put our letter out." |

87. On June 9, 2010, Bryuiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

| | |
|---|---|
| Bryuiannis: | "Still haven't seen or heard of your increase letter yet." |
| Prescott: | "Well, have a look around." |
| Bryuiannis: | "I have. Haven't found anything yet…I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?" |
| Prescott: | "People will lie to you, Dean." |
| Bryuiannis: | "Are you around the same time frame as us? July 5th or what?" |
| Prescott: | "Ah, yah, close." |
| Bryuiannis: | "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?" |
| Prescott: | "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and…I guess one of the other U.S. guys. You know, everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?" |
| Bryuiannis: | "Well at the end of the day over the last two increases we have chatted about it so just wanna make sure you got your letter out." |
| Prescott: | "Yah. Okay pal." |

88. Additional documents, including emails, provide further evidence of this conspiracy and communication among the competitors.

    a. On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas.) On May 29, 2008, Jeff Carter for-

22

warded this email and price increase letter to David Gurley at Vitafoam, which Gurley then forwarded to his superior at Vitafoam, the company President.

b.      On July 7, 2008, Jeff Carter while still at Scottdel forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating, "David, Here is a copy of our next increase letter.  Jeff."  Gurley forwarded this email and draft increase letter to the company President.  The President forwarded this string of emails and draft increase letter to his subordinates at Vitafoam, the V.P. Sales & Marketing, and Steve Prescott.

c.      On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough!  Check with your Carpenter contact to see when they plan on pulling the trigger."

d.      On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

> "Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show.  He said they went up the full 12% in Vancouver and they have gotten some for the business back.  He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up.  I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up.  Carmine has been after him for copies of their pricing but he can't get his hands on it.  He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now."  Prescott asked in an email to Miller "Will Ben share info?"  Miller shortly thereafter on the same day responds to Prescott via email, stating, "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

e.      On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to other Vitafoam employees.  One of the recipients, David Gurley of Vitafoam, for-

warded those price increase letters to Jeff Carter of Future Foam in Texas. Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating:

> "Louie and David, You probably have seen all these. It's crazy out there again, personally I don't think this is enough of an increase."

    f.    Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam. Gurley forwarded the string to his superiors at Vitafoam, V.P. of Sales and President with the message:

> "Please keep this confidential and read from the bottom up. It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley. Louie Carson is one of the owners of Scotdel."

## Industry Meetings

89.    Representatives of Defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("IPSA"), and Surfaces, a trade group which includes polyurethane carpet underlay producers.

90.    As previously stated, representatives from defendant companies reached agreements at these industry meetings held in the United States and abroad.

91.    Representatives of defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

92.    Representatives of defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

93.    Representatives of defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market, and attended these meetings to further demonstrate their control.


## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

94.    Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to disclosure of Vitafoam's cooperation with the DOJ.

95.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs.  These violations constitute injurious acts which restart the applicable statute of limitations

96.    In addition, defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the United States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

97.    Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

98.     Neither defendants nor their co-conspirators told Plaintiff or other class members that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, defendants' and their co-conspirators' conspiracy was inherently self-concealing.

99.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

    a.      By meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

    b.      By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

    c.      By using first names and initials on written communications to disguise their source;

    d.      By holding secret meetings outside and separate from the formal trade association meetings defendants were publicly attending;

    e.      By disguising price-fixing meetings and communications as technical and operational meetings; and

    f.      By using fax machines at publicly available outlets to disguise the source of faxes.

## ANTITRUST INJURY

100.    The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.      Prices charged by defendants and their co-conspirators to plaintiff and the members of Class for polyurethane foam products were maintained at artificially high and supracompetitive levels;

b.      Plaintiff and members of the Class were required to pay more for polyurethane foam than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.      Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

101.    During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased polyurethane foam in the United States.

102.    Plaintiff and the other Class members paid more for the polyurethane foam than they would have paid under conditions of free and open competition.

103.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

104.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

106.    Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities which purchased polyurethane foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

107.    Plaintiff brings this action on its own behalf and as a class action under Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

108.    Due to the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands, the exact number and identities being known only by Defendants.

109.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

110.    Class members are identifiable from information and records in the possession of Defendants.

111.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common patter of injury sustained as a result thereof.  The questions include but are not limited to:

a.    Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.    The identity of participants in the conspiracy;

28

c.      The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in the furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f.      The effect of defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

g.      The appropriate measure of damages sustained by plaintiff and other members of the Class.

112.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other members of the Class, and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff bought polyurethane foam directly from one or more of defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

113.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

114.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

115.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

116.    The conduct of defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*:

a.      Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

b.      Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

c.      In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

d.      The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

117.     Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

118.     From a date unknown, but beginning at least as early as 1999 and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

119.     In furtherance of the unlawful conspiracy, each of defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    a.     agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

    b.     communicating with co-conspirators regarding prices to be charged for polyurethane foam;

    c.     agreeing to allocate customers;

    d.     meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

    e.     refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

120.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

121.     Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined ac-

31

cording to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

122.    The conduct of defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, plaintiff petitions that:

A.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the Class.

B.    The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

D.    Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

   a.    Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

b.	Communicating or causing to be communicated to any other person en-

gaged in manufacture, distribution or sale of polyurethane foam except to the extent ne-

cessary in connection with a bona fide sales transaction between the parties to such com-

munications.

E.	Plaintiff and members of the Class have such other, further, and different relief as

the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial of all issues triable by jury.

Dated: September 8, 2010.

Respectfully submitted,

**THE VAN WINKLE LAW FIRM**

By: s/ Larry McDevitt
Larry S. McDevitt, NC #5032
David M. Wilkerson, NC 35742
11 North Market Street
Asheville, NC 28801
Telephone: 828-258-2991
Fax:  828-255-0255
E mail:  lmcdevitt@vwlawfirm.com
E mail:  dwilkerson@vwlawfirm.com

**MURRAY, FRANK & SAILER LLP**
Brian Murray
Lee Albert
275 Madison Ave, 8th floor
New York, NY 10016
Telephone: 212-682-1818
Fax: 212-682-1892
E mail:  bmurray@murrayfrank.com
E mail:  lalbert@murrayfrank.com

Counsel for Plaintiff and the Proposed Class

33